INDIANAPOLIS MOTOR SPEEDWAY COMPANY *v.* SHOUP.

[No. 13,029. Filed February 15, 1929.]

*Elliott, Weyl & Jewett,* for appellant.

*Roy C. Street, W. Lynn Parkinson* and *Charles L. Tindall,* for appellee.

NICHOLS, J.—Action by appellee against appellant, the Indianapolis Motor Speedway Company, the Durant Motor Company of Indiana, William C. Durant and Clifford Durant, for damages occasioned by the injury and death of appellee's minor son, Bert Shoup, who was struck by a racing car at the Speedway on May 30, 1923,

while he was viewing the race from outside the enclosure surrounding the race track of appellant.

There was a trial by jury and a verdict in favor of appellee against appellant for $2,500. The cause was dismissed as to the defendants Durant Motor Company of Indiana and William C. Durant and a verdict in favor of Clifford Durant.

The principal question in this case is the sufficiency of the evidence to sustain the verdict, and, as we view this case, when we have determined this question, we do not need to consider others presented.

It appears by the evidence that appellant conducts annually, near Indianapolis, an internationally-known automobile race, offering large money prizes for the world's fastest cars, and invites drivers of national prominence to drive these cars, and did conduct such a race on May 30, 1923, and has conducted like races on each May 30 since 1909, except the years 1917 and 1918.

The race track is of brick, oval in shape, and has a circumference of two and one-half miles. The long way of the track is north and south, and at either end is a turn which is banked so as to allow cars traveling at a high speed to negotiate the turns. On either side is a long stretch of straight track known as the "straightaway." The track is fifty feet wide on the straightaways and sixty feet wide on the turns. At either end, along the turns, there are retaining walls, built to prevent cars from leaving the track. Grandstands for the accommodation of visitors are placed along the west side of the track and at the south end, but none on the north or east. There are retaining walls along the west side of the track and at both ends, but none on the east straightaway. Inside the oval is what is known as the "infield," devoted to parking; on the east side, the infield is separated from the track by a wire fence, set about fifty feet inside the track. Spectators are allowed inside the wire fence,

but not allowed between the fence and track. A high board fence, approximately nine feet high and closely built, surrounds the entire track.

There are several entrances into the Speedway grounds, but one, the one on the east side, is involved in this case.

On the east side of the track, some 150 or 200 feet north of the southeast turn, there is a gate; a roadway leads through this gate, across the track, to the infield. Going in the other direction, this roadway, which is private, leads to the southeast across other land of the appellant, and to the Crawfordsville road, where there is another gate. Patrons, who so desire, are admitted through these gates until a short time before the race is to begin, when the gates are closed. This is made necessary because persons entering in that manner have to cross the race track, and, of course, that has to be stopped before the race begins.

This east gate is an ordinary farm gate, made of slats, and it is possible for one to look through it and get a view of a portion of the track. The distance from the board fence to the track is approximately fifty feet.

The land of the Speedway company lying east of the high board fence consists of about seventy acres, and extends about one-third of the way up the east side; the Marion County Infirmary grounds join the race grounds from that point to the north end of the track.

On May 30, 1923, and at and before the time of the races, appellant had a number of guards employed to patrol the fence on the east side for the purpose of keeping trespassers out. These guards patroled the entire length on the inside of the board fence, and up to the county farm line on the outside of the fence.

There was a fence between appellant's land and the county farm, and, on May 30, 1923, there was a hole in the fence somewhere near where it joined the high

board fence, and a path led from that hole down the fence line to the gate above mentioned.

There were "No Trespassing" signs on the land of appellant, outside of and to the east of the board fence. Prior to the race in 1923, appellant advertised this race, for that year, all over the whole United States inviting the public to come and see this international event. Among the persons who read these advertisements were Bert Shoup, who was then a boy about fifteen and one-half years old and the son of appellee, and Fay Layton, Fay Fryer, Charles Elliott, Murwood Ward and Harold Griffin, all of LaFayette, and they determined to attend the race.

They rode a freight train, without the payment of fare, from LaFayette to a water tank near the Speedway, arriving there in midafternoon on May 29, and later went to Riverside park, an amusement park, where they remained until about midnight and spent most of their money, slept on the ground along the roadside until about 6 o'clock in the morning of May 30, ate breakfast at a roadside stand and went to the main entrance, at the west end of the south side of the grounds, where they learned that the admission fee was $2, and, not having sufficient money to pay this fee, they started north along the outside of the fence with the intent to find a place, if possible, from which they could see the race without paying. They traveled around the north end, down the east side, went through the hole in the fence dividing the county farm from the Speedway land, and followed the path to the gate on the east side. The gate was still open, and persons were going through, but the gate was closed and locked soon after their arrival.

In the near vicinity of the gate, and lying just outside the high board fence, was an old iron oil tank of sufficient height that by standing on it they could look over the fence. There were also some other objects, such as a

chair and some boxes and barrels and an old sand screen, near the gate. These boys, including Bert Shoup, climbed on these objects and looked over the fence, but were directed by a guard to get down, or stay away, and then they were told they could stay there, but not to touch the fence for it was rotten and might fall down, and Bert and the boys viewed the race through the slats of the gate, but were ordered not to hang on the gate.

At the time of the injury, the boys were all around the gate, some sitting and some lying on the ground. They did not, at any time, enter the enclosure surrounding the track, nor pay an admission fee.

The race started about 10 o'clock a. m., with twenty-four cars, and some time thereafter, one car, a Durant, became unmanageable, careened about and left the track, ran through the gate, struck Bert Shoup and inflicted injuries which resulted in his death the same day.

The jury found, in answer to interrogatories submitted to it by the court, that Bert Shoup was a boy fifteen and one-half years of age, and that he was a normal boy for one of his age. It would seem from this finding, that we might well dismiss from our consideration any question as to whether he was *non sui juris*. Certainly, appellee must have believed him to be *sui juris* when he permitted him to come from LaFayette to Indianapolis, with a number of other boys otherwise unattended, to stay over night in a large city filled almost to capacity with people from all parts of the country, we may say from all over the world. Whatever may be said as to the propriety of conducting such races on Memorial Day, this fact, within itself, or the circumstances surrounding this case, does not present for our consideration the Speedway as an attractive nuisance, and if it might be said that the place at which

the accident occurred presented such conditions as to make of it an attractive nuisance, still there would be no liability under this doctrine, for the boys did not discover such place until after they had themselves become trespassers. *United Zinc Co.* v. *Britt* (1922), 258 U. S. 268, 66 L. Ed. 615. What are commonly known as the turn-table cases, and other cases presenting the doctrine of "attractive nuisance," have no application to the facts and circumstances of this case.

Appellee contends that his son had seen the advertisements of the races, and that thereby impliedly he was invited to attend them. There can be no doubt that an invitation may be extended to the public by advertisements, but it can hardly be contended that this advertisement was an invitation to the public to attend the Speedway for the purpose of looking over the fence or through the slats of the gate at the race. As was said in *Bottum* v. *Hawks* (1911), 84 Vt. 370, 79 Atl. 858, 35 L. R. A. (N. S.) 440, Ann. Cas. 1913A 1025, "an invitation, though implied, cannot logically or fairly be said to exist where no intent to invite exists." These boys, including appellee's son, together with the public at large, were invited to the Speedway to see the race, but it needs no argument to convince us that they were invited to purchase tickets and pass through the gates of entry in the regular way to the places to which their tickets entitled them, and when they started around the outside of the fence, in search of a hole in the fence, or some means of entering without paying as they were invited to do, and when they entered upon the grounds of appellant with such purpose, they became trespassers, and such they continued to be, unless it may be said that the guard's statement that they could stay there as long as they didn't touch the fence, and that they could stay there but to stay back away from the gate changed this status.

Thereafter, the most that can be said for them is that they became licensees. We further quote from *Bottum* v. *Hawks, supra,* that: "Neither silence, acquiescence nor permission, however, standing alone, is sufficient to establish an invitation. A license may thus be created, but not an invitation." There is no evidence whatever that the guards had any authority to invite anyone to look over the fence or through the gate. On the contrary, the evidence shows that the guards were instructed that no one was allowed to be there, and to take those who came there off the place. It is the law that where a person is invited to a place by an employee who has no authority to give the invitation, and he accepts, he becomes a trespasser or mere licensee, to whom the master owes no duty to exercise care. *Springer* v. *Byram* (1894), 137 Ind. 15, 27, 36 N. E. 361, 23 L. R. A. 244; *Cooper* v. *Lake Erie, etc., Co.* (1894), 136 Ind. 366, 36 N. E. 272; *Pittsburgh, etc., R. Co.* v. *Hall* (1910), 46 Ind. App. 219, 90 N. E. 498.

In *Faris* v. *Hoberg* (1893), 134 Ind. 269, 33 N. E. 1028, 39 Am. St. 261, it is stated that: "The owner or occupant of any premises is not under any legal duty to keep them free or safe from the danger of obstructions, pitfalls, excavations, trap-doors or openings in floors for persons who go upon, into or through the premises, not by his invitation, express or implied, but for their own pleasure or convenience, though by his acquiescence or permission, and who, therefore, are mere licensees. Such a visitor enjoys the license subject to the attendant risks."

The charge against appellant is want of the exercise of due care, or negligence, and since appellee's son was at most a mere licensee, appellant owed him no legal duty in this regard. Having reached this conclusion, we do not need to discuss other questions.

The judgment is reversed, with instruction to grant a new trial.

McMahan, P. J., dissents.