## LIGGETT & MYERS TOBACCO CO. v. DE PARCQ.

No. 9704.

Circuit Court of Appeals, Eighth Circuit.

July 19, 1933.

Rehearing Denied Sept. 13, 1933.

L. P. McNally, of Minneapolis, Minn., and F. L. Fuller, of New York City (F. H. Stinchfield and Donald A. Holmes, both of Minneapolis, Minn., on the brief), for appellant.

Mortimer H. Boutelle, of Minneapolis, Minn. (A. H. David and Robert J. McDonald, both of Minneapolis, Minn., on the brief), for appellee.

Before KENYON and GARDNER, Circuit Judges, and DEWEY, District Judge.

GARDNER, Circuit Judge.

This is an action brought by appellee to recover damages for personal injuries alleged to have been sustained by him as the result of the negligent driving of an automobile by an employee of the appellant.

The parties will be referred to as they appeared below.

It is alleged in the complaint that plaintiff was riding as a passenger in an automobile driven by James K. Thompson and then being used in the business of defendant Liggett & Myers Tobacco Company, upon a state highway in Marshall county, Minn., and, when about four miles north of Middle River, Minn., defendants "so carelessly and negligently and unlawfully operated, managed and controlled the said automobile in such a manner so that the said automobile was caused to turn over on said highway and plaintiff was thereby caused to suffer and sustain injuries to his person." It is also alleged that the automobile at the time of the accident was being driven at a rate of speed that was greater than reasonable and proper under the circumstances; that proper lookout was not kept; that the automobile was not kept under reasonable and proper control; that defendants carelessly and negligently failed to keep the automobile in reasonably safe condition, and failed and omitted to make reasonable inspection thereof, and that, while the automobile was out of repair and in a dangerous condition known to the defendants but unknown to the plaintiff, it was caused to be driven into and through some loose gravel on the highway and thereby caused to be thrown out of its course, and the left front wheel of the automobile was caused to break and collapse, and said automobile was thereby caused to turn over on said highway, and plaintiff was thereby caused to suffer and sustain a fracture of some of the vertebræ and injuries to his spinal cord, etc.

The answer of the defendant, Liggett & Myers Tobacco Company, admits its corporate existence, denies that Thompson, who was joined as a defendant, was acting as its agent in inviting or permitting plaintiff to ride in said automobile, denies generally the allegations of the complaint, except as therein admitted, and alleges plaintiff's contributory negligence. It also sets up as a separate defense that at the time of the accident the Minnesota Workmen's Compensation Act (Minn. St. 1927, § 4261 et seq.) was in effect; that plaintiff·was employed by his father at the time the accident occurred, and was acting in the scope of his employment in the furtherance of his employer's business, and that both he and his employer had elected to come under, and were bound by, the Minnesota Workmen's Compensation Act; that plaintiff, pursuant to the terms of said act, had proceeded against his employer and the insurer of his employer, and had been awarded compensation under said act; and that, by reason of the facts so pleaded, plaintiff's employer and his insurer had become subrogated to any rights of plaintiff against the defendant, Liggett & Myers Tobacco Company, on account of the injuries received by him.

Plaintiff's reply puts in issue the affirmative allegations of defendant's answer.

At the close of all the testimony, defendant moved for a directed verdict, which·the court denied, sending the case to the jury upon instructions to which no exceptions are taken. The jury returned a verdict for plaintiff in the sum· of $32,800, and from the judgment entered thereon defendant, Liggett & Myers Tobacco Company, has appealed. The questions presented by the appeal are substantially those growing out of the action of the court in denying defendant's motion for a directed verdict, and may be stated as follows: (1) Was there substantial evidence of negligence? (2) Was there substantial evidence of a waiver of a rule of the defendant forbidding employees to carry passengers as guests in the cars of the employer?

and (3) Was the plaintiff precluded from recovering by virtue of the Minnesota Workmen's Compensation Act?

Plaintiff, at the time of the accident in which he received his injuries, June 9, 1923, had been living with his parents at Thief River Falls, Minn., where his father owned and operated the Brummund Hotel. He was in the employ of his father, doing general work at the hotel. Defendant was engaged in the sale of tobacco products; its business extending largely throughout the United States, including the state of Minnesota. One James K. Thompson was at that time one of defendant's soliciting salesmen, his territory including the northwestern part of Minnesota, which he covered from the city of Thief River Falls. He had for some time been making his headquarters at the Brummund Hotel, and from that place covered for his company the northwestern part of Minnesota. Defendant supplied Thompson with a model T Ford roadster, with a large square box in the rear, in which he carried tobacco for cash sales and samples, and advertising matter and materials. Thompson stopped at the Brummund Hotel periodically, remaining there from two to three weeks at a time while visiting neighboring towns.

On the morning of June 9, 1923, Thompson asked plaintiff to go with him on a trip to Warroad, a Minnesota town on the Canadian border, about 100 miles north from Thief River Falls. Plaintiff was employed at his father's hotel at the time, and, after talking the matter over with his father, was instructed to go with Thompson and arrange with hotel keepers at Roseau and Warroad to place posters in their lobbies, announcing the reopening of the Brummund Hotel which had been damaged by fire in May. Plaintiff was furnished expense money by his father. Thompson was to call on customers and post advertising on the road, while plaintiff was to assist him in posting the advertising. Thompson, however, knew that plaintiff was going to do work for his father.

The day was pleasant, clear, bright, and cool. The route followed was the main highway. Plaintiff testified that the highway was in good condition; that in the center of the highway were two well-traveled ruts or paths, and there was loose gravel and sand on either side out on the shoulder. At the point where the accident happened, plaintiff testified that the highway was clear, about fifteen or twenty feet wide; that there was very little traffic on it, and there were two well-worn paths, but only one lane of traffic. On either side there was a shoulder and a gradually sloping ditch. The road was level straight, and smooth. As to the handling of the car by Thompson, plaintiff testified as follows:

"Q. Well, let's see now; then for a period of about 600 feet before the accident happened, he had been traveling on the left side of the road? A. Yes, sir.

"Q. And where were the right front and the right rear wheels traveling, with respect to the center marks? A. That would mean that the left front and the left hind wheel were up on the left shoulder of the road, and the right front and the right hind wheel were up on the high territory or high place between the two well traveled places in the road, so that he was traveling in one of those main traveled paths.

"Q. Well, was there any large amount of sand and gravel accumulated outside of those ruts? A. It was noticeable that there was, yes. That strip of gravel would be between the left front and rear wheels, and the right front and rear wheels as I have described the road, and the car.

"Q. Well, after Thompson traveled for about 600 feet on the left side of the road, what did he then do? A. He made an attempt to run back into the center of the road.

"Q. At that time what speed was he going? A. Probably between 25 and 30 miles.

"Q. And was that the speed he had been traveling approximately all the way? A. Approximately.

"Q. And as he was going at a speed of 25 or 30 miles an hour, which way did he turn the automobile? A. To the right.

"Q. And when he turned the car to the right, did he maintain the same speed, or a different speed? A. At first the same speed.

"Q. When he turned to the right, what happened? A. In order to turn back to the center of the road, the left front wheel had to mount that ridge of loose sand, or gravel, which I just described, and when it started to cut in, it didn't want to climb over readily, and the car started to shimmy a little bit, jerked, and it was necessary to cramp it, which he did. He gave it the gas in order to follow it through. He pulled it around to the right, and that car turned over to the left and rolled completely over onto its feet.

682

"Q. You say he increased his speed. To what extent did he increase his speed? A. That would be pretty hard to say. There was no speedometer on his car. He increased the gas, I should say.

"Q. He stepped on the gas? A. Yes, he stepped on the gas.

"Q. Was that after the car had shimmied? A. Yes.

"Q. And before it mounted or went over the gravel? A. As it was shimmying.

"Q. I see. Then when he cramped it, or turned it, which way did he turn it, to the right or to the left? A. To the right.

"Q. Did he do that quick or gradually? A. Rather quickly at first.

"Q. Did he cramp it and turn quickly before or after the car had shimmied? A. After it had shimmied. * * *

"Q. State how he turned the wheel after it would not go over or climb over the ridge of sand and gravel? A. He gave it a sudden, quick jerk.

"Q. And that jerk was to the right or to the left? A. To the right.

"Q. Did this left front wheel at any time actually go over the ridge of sand and gravel? A. No.

"Q. Can you tell us how high this ridge of sand and gravel was above the ground? A. No, I could not. * * *

"Q. Well, now, can you give us your estimate as to how far forward the car traveled after the wheels were turned, and it started to shimmy? A. Fifteen or twenty feet.

"Q. And at what point did Mr. Thompson increase the speed of his automobile? A. After it started to shimmy. * * *

"Q. And when the car actually turned over, can you tell how fast it was traveling? A. I could not say.

"Q. Can you give us an estimate? A. Yes, I could say, when it struck the sand, we were going twenty-five or thirty miles an hour, and when it turned over, probably twenty miles an hour."

Thompson gave the following version of the accident:

"I was familiar with the highway to Warroad. It was a graveled road built on a dredged ditch bank. The gravel was not the same thickness over the road. There may have been some ridges of gravel, and I think I did see some in certain places.

"The accident happened about six miles north of Middle River. I stopped at Middle River for oil and once thereafter to fix the carburetor. At the time of the accident I was traveling about in the center of the road. I don't recall traveling on the left side of the road just prior to the accident. There was soft gravel on the sides of the highway and I think the center was a little harder than the sides. I tried to keep in the single track but I might have been to the right or left of the track at times. I don't remember. I drove between twenty-five and thirty miles per hour. When the accident happened I struck some loose sand with the left front wheel. I don't remember whether I was traveling in the single track or not. I don't recall striking any loose gravel until just a few feet, probably ten feet, before the accident happened, even though the road was gravel and sand all the way. At the time I was going twenty-five or thirty miles per hour, which was the speed when we turned over. When I hit it the car pulled sideways to the left and I just tried to straighten it up by turning the wheel to the right. I don't recall if there was a ridge of gravel or sand. The car turned. I do not remember increasing or decreasing the speed of the car after finding it difficult to make the turn to the right at the time of the accident. The car tipped to the left and turned completely over, at that time I was holding on to the wheel, and I think the wheels were turned a little to the right and then the rear end of the car swung to the left and it turned over and landed crosswise of the road. I don't think the car went up into the air in making the turn because it was just kind of a natural roll. The left front of the car seemed to kind of drop as the wheel broke and the left front fender kind of scooped up the gravel."

Thompson also testified:

"Q. What did you notice about the condition of the highway? A. I noticed there was some pretty loose sand there, gravel.

"Q. And over what part of the roadway or highway did that loose sand or gravel extend, over what distance? A. I don't know.

Generally, no inference of negligence arises from the happening of an accident of this character. Kramer v. Mills Lumber Co. (C. C. A. 8) 24 F.(2d) 313, 60 A. L. R. 366; Railway Express Agency v. Little (C. C. A. 3) 50 F.(2d) 59, 75 A. L. R. 963; Leahy v. Detroit, M. & T. Short Line Ry. (C. C. A. 6) 240 F. 82.

The court instructed the jury that under the evidence there were no such defects

in the automobile as would render the defendant liable, and submitted to the jury the question as to whether or not Thompson was negligent in the manner in which he drove the car. The court also instructed the jury that it was not negligence for Thompson to have left the center of the road and drive on the left-hand side, and limited the questions of negligence to be considered by the jury to the rate of speed at which the car was being driven, and the manner in which Thompson handled his car in turning from the left portion of the road toward the center of the road, advising the jury that, "where one is confronted by an emergency which did not arise through his own negligence, he cannot be charged with an error in judgment, and he is not required to choose his path at his peril. Of course, Thompson was not responsible for the accumulation of sand or gravel. It was there in the road, just exactly where I don't know whether it appears very clearly in the testimony or not. Whatever that situation may be, when he commenced his turn it will be for you to say whether or not he exercised reasonable care." The verdict of the jury must therefore rest upon either one or both of these two claims of negligence.

■ The burden of proof was upon the plaintiff to establish actionable negligence.

■ Accepting the instruction of the court that defendant might be liable, if Thompson were acting within the scope of his employment, for his failure to exercise ordinary care, as a correct statement of the law, that "degree of care is such care as a reasonably prudent man would exercise in view of all of the surrounding circumstances." S. S. Kresge Co. v. McCallion (C. C. A. 8) 58 F. (2d) 931, 932. The only testimony as to the circumstances surrounding the accident is that of plaintiff and Thompson. While Thompson was joined as a defendant in the action, he either was not served, or, if served, made no appearance or defense, and at the time of the trial was not in the employ of the defendant Liggett & Myers Tobacco Company. Certainly there is nothing in the testimony of Thompson which would warrant the jury in finding that he was guilty of negligence in the handling of the car at the time of the accident. In fact, plaintiff bases no argument upon that testimony. If there is substantial evidence of negligence, it must therefore be found in the testimony of plaintiff. He testified that there were two well-traveled ruts or paths, on either side of which there was loose gravel; that Thompson had the wheels of the car out of the traveled paths and followed the strips of gravel for about 600 feet. In one part of his testimony he describes the manner in which the car was being driven just prior to the accident, as follows:

"Q. And where were the right front and the right rear wheels traveling, with respect to the center marks? A. That would mean that the left front and the left hind wheels were over on the left shoulder of the road, and the right front and the right hind wheel were up on the high territory or high piece between the two well traveled places in the road so that he was traveling in one of those main traveled paths."

■ If his testimony as to the location of the wheels of the car is true, then his conclusion that "he was traveling in one of those main traveled paths" is a physical impossibility. While, on the other hand, if his conclusion is correct, then his statement as to where the wheels of the car were traveling cannot be true. Neither court nor jury may credit testimony positively contradicted by physical facts. United States v. Harth (C. C. A. 8) 61 F.(2d) 541; United States v. McGill (C. C. A. 8) 56 F.(2d) 522; Ed. S. Michelson, Inc., v. Nebraska Tire & Rubber Co. (C. C. A. 8) 63 F.(2d) 597.

Plaintiff testified that, after Thompson traveled for about 600 feet on the left side of the road, he attempted to turn into the center of the road, and that in so doing the left front wheel came into contact with loose sand or gravel, and that, as it did so, "the car started to shimmy a little bit, jerked, and it was necessary to cramp it, which he did." He testified that Thompson in these circumstances stepped on the gas; that "he pulled it around to the right, and the car turned over to the left;" that he stepped on the gas as the car "was shimmying." Again plaintiff testified as follows: "Q. Did he cramp it and turn quickly before or after the car had shimmied? A. After it had shimmied."

He further testified that, when Thompson started to turn back to the center of the road, he did it gradually, but, when the car skidded, he cramped it quickly to the right.

There is nothing in the record from which the jury might properly have concluded that the handling of this car in the emergency which confronted Thompson was not skillful, or that he was negligent. It appears that he was turning into the main-traveled portion of the road gradually, which certainly did not indicate negligence, but for some

reason the car "shimmied," the rear end swinging to the left, and it was not until this happened that Thompson turned his front wheels to the right in order to keep the front wheels properly aligned with the back wheels, which, so far as appears from the evidence, was a very skillful handling of the car.

While plaintiff used the terms "ridge of sand and gravel," he testified that he could not tell how high this ridge was above the ground, and there is no testimony in the record to show how much of a ridge of sand or gravel there was. All gravel roads are composed, to a greater or less extent, of loose gravel. Plaintiff's testimony left it to the jury to guess and speculate upon how high, how wide, and how extensive the so-called ridge or ridges of gravel were.

Plaintiff's witness Thompson testified that at the time of the accident he struck some loose sand with the left front wheel, and that, "when I hit it (the loose gravel) the car pulled sideways to the left and I just tried to straighten it up by turning the wheel to the right. I turned the wheel a natural turn. I don't recall if there was a ridge of gravel or sand. * * * The car tipped to the left and turned completely over. At that time I was holding on to the wheel, and I think the wheels were turned a little to the right and then the rear end of the car swung to the left and it turned over and landed crosswise of the road. * * * The left front of the car seemed to kind of drop as the wheel broke, and the left front fender kind of scooped up the gravel." This corroborates the plaintiff as to the manner in which Thompson handled the car, and shows that the turning of the front wheels to the right did not occur until the rear of the car had skidded, swinging the hind wheels to the left, which necessitated turning the front wheels to the right, just as they were manipulated by Thompson.

Thompson said the gravel was not the same thickness over the road; that there may have been some ridges of gravel, and he thought he saw some in certain places; that at the time of the accident he was traveling in the center of the road, and did not recall traveling on the left side of the road just prior to the accident, and did not recall striking any loose gravel until just a few feet, possibly ten feet, before the accident happened, although the road was gravel and sand all the way.

■ The testimony of both witnesses is consistent with the theory that a patch of loose sand or gravel was encountered suddenly, without previous indication or warning. When the rear of the car skidded to the left, Thompson turned the front wheels toward the right, which would seem to be the act of a skillful driver, and there is no evidence that it was negligent so to do. He was confronted with an emergency, and was required to act at once, without adequate time to consider all the possible methods of handling the car or means of escape from danger, and no one testified to any more skillful or better manner of handling it. There is no evidence that the emergency with which he was confronted was brought about by his own negligence, and in such circumstances he could not be held to have been negligent, even though he failed to adopt what subsequently and upon reflection may have appeared to have been a better method of handling the car. Davis v. Chicago, R. I. & P. R. Co. (C. C. A. 8). 159 F. 10, 16 L. R. A. (N. S.) 424; Greyhound Lines, Inc., v. Noller (C. C. A. 7) 36 F.(2d) 443; Siegl v. Watson, 181 Wis. 619, 195 N. W. 867.

■ It appears from the undisputed testimony that the left front wheel collapsed. There is no evidence that there was any known defect in this wheel, and the court instructed the jury that no recovery could be had based upon its collapse. The breaking of the wheel at the time the car struck the loose gravel and the rear end skidded to the left, necessitating the turning of the front wheel to the right, may well have been the cause of the accident. If that were the cause of the accident, then the defendant is not liable, and, where proven facts give equal support to each of two inconsistent inferences, judgment must go against the party upon whom rests the burden of sustaining one of these inferences as against the other. United States Fidelity & Guaranty Co. v. Des Moines Nat. Bank (C. C. A. 8) 145 F. 273; Eggen v. United States (C. C. A. 8) 58 F.(2d) 616; Pennsylvania R. Co. v. Chamberlain, 288 U. S. 333, 53 S. Ct. 391, 77 L. Ed. 819; Stevens v. The White City, 285 U. S. 195, 52 S. Ct. 347, 350, 76 L. Ed. 699; Southern Railway Company v. Walters, 284 U. S. 190, 52 S. Ct. 58, 76 L. Ed. 239; Gunning v. Cooley, 281 U. S. 90, 50 S. Ct. 231, 74 L. Ed. 720; Smith v. First National Bank in Westfield, 99 Mass. 605, 97 Am. Dec. 59.

■ To sustain the verdict, plaintiff urges that the accident was caused by the negligent handling of the car. He might with equal justification have urged that the ac-

cident was caused by reason of the defective condition of the car. In Smith v. First Nation Bank, supra, quoted with approval in Pennsylvania R. Co. v. Chamberlain, supra, it is said: "There being several inferences deducible from the facts which appear, and equally consistent with all those facts, the plaintiff has not maintained the proposition upon which alone he would be entitled to recover. There is strictly no evidence to warrant a jury in finding that the loss was occasioned by negligence, and not by theft. When the evidence tends equally to sustain either of two inconsistent propositions, neither of them can be said to have been established by legitimate proof. A verdict in favor of the party bound to maintain one of those propositions against the other is necessarily wrong."

In Stevens v. The White City, supra, the Supreme Court said: "The burden of proof as to respondent's negligence remained upon petitioner throughout the trial. His contentions clearly show that the evidence leaves the time, place, and cause of the injury in the realm of conjecture. The evidence is consistent with an hypothesis that the tug was not negligent and with one that it was, and therefore has no tendency to establish either."

A host driver of an automobile owes his guest a duty to exercise ordinary care not to increase the danger or add a new one to those assumed when he entered the car, and, when the guest enters the car, he accepts it in its existing condition, except as to latent defects known to the driver, and he likewise accepts the driver with his habits of driving so far as known to him, with such skill in operating the car as he actually possesses. Rappapart v. Stockdale, 160 Minn. 78, 199 N. W. 513; Barger v. Chelpon (S. D.) 243 N. W. 97; Poneitowcki v. Harres, 200 Wis. 504, 228 N. W. 126; Cleary v. Eckart, 191 Wis. 114, 210 N. W. 267, 51 A. L. R. 576. There is no evidence in the record warranting the inference that the car was being driven at an excessive rate of speed, nor that the rate of speed was the proximate cause of the accident.

We conclude on this branch of the case that there is no substantial evidence that the accident resulting in plaintiff's injuries was due to any actionable negligence, and the verdict for plaintiff must rest on surmise, conjecture, and speculation. A new trial must therefore be granted because of the insufficiency of the evidence as to negligence. On a retrial of the action, the question as to the sufficiency of the evidence to establish a waiver by the defendant of its rule forbidding Thompson to carry passengers in the car furnished him by defendant will likely again be involved, and we shall therefore consider that issue.

An employee in possession of his employer's automobile has no implied or apparent authority to invite others to ride with him, and, if a passenger is injured by the negligence of an employee while riding in the employer's automobile pursuant to an invitation of the employee, the employer is not liable, for the reason that the passenger does not become a guest of the owner of the automobile. White v. Brainerd Service Motor Co., 181 Minn. 366, 232 N. W. 626, 627; Dearborn v. Fuller, 79 N. H. 217, 107 A. 607; Higbee Co. v. Jackson, 101 Ohio St. 75, 128 N. E. 61, 14 A. L. R. 131; Union Gas & Electric Co. v. Crouch, 123 Ohio St. 81, 174 N. E. 6, 74 A. L. R. 160; Chajnacki v. Dougherty, 254 Mich. 296, 236 N. W. 789; Rolfe v. Hewitt, 227 N. Y. 486, 125 N. E. 804, 14 A. L. R. 125; Psota v. Long Island R. Co., 246 N. Y. 388, 159 N. E. 180, 62 A. L. R. 1163; Monnet v. Ullman, 129 Or. 44, 276 P. 244; Hughes v. Murdoch Storage & Transfer Co., 269 Pa. 222, 112 A. 111; Wing v. Martin, 101 Vt. 108, 141 A. 602.

In White v. Brainerd Service Motor Co., supra, decided by the Supreme Court of Minnesota, it is said: "There is no good reason apparent to us for holding that a jury may be allowed to infer that a servant or chauffeur driving an automobile has ostensible or implied authority to invite or permit others to ride. It is not in the interest of the ordinary automobile owner to give free rides to others and incur the risk incident to so doing. In this day of streets and highways overrun with motor vehicles operated so often at high and reckless speed, every owner of an automobile incurs a heavy risk when the car leaves the garage, and should not lightly be held to have authorized his servant or chauffeur to invite passengers for whose safety he as owner must also vouch."

The authorities generally make an exception in the case of wanton or willful negligence of the employee; but there is in this case no claim of such wanton or willful negligence, so that that exception need not be considered. But, while the employer is not liable under the circumstances recited, he may become liable if impliedly or expressly he authorizes the employee to trans-

port passengers, in which event he will be liable for the employee's negligence, even though there was a rule forbidding the employee so to do. Paiewonsky v. Joffe, 101 N. J. Law, 521, 129 A. 142, 40 A. L. R. 1335; Hayes v. Pine State Creamery, 195 N. C. 113, 141 S. E. 340. The promulgation of a rule will not protect the employer from liability where the employer does not himself respect it. Schirmer v. Goss (C. C. A. 2) 200 F. 396; Pittsburgh, C. C. & St. L. R. Co. v. Cole (C. C. A. 6) 260 F. 357; Consolidation Coal Co. v. Marcum (C. C. A. 6) 257 F. 287; Tullis v. Lake Erie & W. R. Co. (C. C. A. 7) 105 F. 554; Cleveland, C. C. & St. L. R. Co. v. Baker (C. C. A. 7) 91 F. 224. So it is contended here that, while there was a rule forbidding Thompson to carry passengers, it had been waived or abandoned by defendant. It is elementary that "the principal is bound only to the extent of the appearance he gives, or knowingly permits the agent to give, or might reasonably expect the agent to give, to the agency, and not by any appearance of agency beyond this that the agent himself wrongfully produces without the knowledge or consent of his principal. It is only acts within the scope of the apparent authority with which the principal clothes the agent, not those within the scope of the apparent authority with which the agent wrongfully clothes himself, without the assent or knowledge of his principal, that are binding upon the latter." Chicago, St. P., M. & O. R. Co. v. Bryant (C. C. A. 8) 65 F. 969, 973. See, also: Maloney Tank Mfg. Co. v. Mid-Continent Petroleum Corp. (C. C. A. 10) 49 F.(2d) 146.

█ There can be no waiver without knowledge. Rand v. Morse (C. C. A. 8) 289 F. 339; G. Amsinck & Co. v. Springfield Grocer Co. (C. C. A. 8) 7 F.(2d) 855; Masden v. Travelers' Ins. Co. (C. C. A. 8) 52 F.(2d) 75, 79 A. L. R. 469.

Recognizing these principles of law, plaintiff produced evidence which he claims sufficient to establish a waiver by defendant. Thompson had worked out of Thief River Falls since 1922. Prior to the accident, plaintiff had had rides in the car with Thompson, and had helped Thompson put up signs and advertising matter. He testified that Thompson had taken him riding in the car in the presence of Collier, Hillskolter, Rosenquist, and probably Hogan, all employees of the defendant, without any protest from either of them. He was not positive that he had

done so in the presence of Hanson. He named a number of other persons whom he had seen riding in the car at the time of the county fair at Thief River Falls in 1922 in the presence of Rosenquist and Hogan. Other witnesses testified that they had seen Thompson carrying passengers in the car in the presence of Rosenquist at the county fair. One witness testified that on several occasions he saw Thompson carrying passengers in the car, and had himself been a passenger with the knowledge and in the presence of the district or division manager of defendant. When, however, asked on cross-examination who defendant's manager was, he said he was Mr. Hogan, but it appears from the evidence that at the time of the accident Hogan was a salesman, and had not been made a division manager until 1926. Still other witnesses testified that they had ridden in the car with Thompson in the presence of Rosenquist, some stating that this was at the county fair. Thompson testified that, when Rosenquist hired him and he first took out the car, Rosenquist told him, "This car is to be used for company purposes only, but if you have some girl friend and she is a real nice girl and she wants to go some place I am not going to tell you not to take her." He testified that, when Rosenquist saw him carrying passengers other than employees, he was making trips from the fair grounds to the hotel and around Thief River Falls. There was also testimony that Thompson had taken people riding without the knowledge of any other employee of defendant.

At the time of the trial Rosenquist was dead, and Hogan was confined in an institution for the insane. Of these employees none could have had authority to waive the rule forbidding the carrying of passengers by Thompson except Rosenquist. The others were salesmen like Thompson himself.

█ The court instructed the jury that the defendant could waive and abandon its rule, but that mere isolated violations of it, even though known to the defendant, would not be sufficient, and that, even though Rosenquist may have known of some violations of the rule, that fact was not conclusive that the rule had been waived, but that there must have been such open, frequent violations of the rule for such a length of time that the jury might say from the evidence that the company had elected not to insist on this rule. As already observed, the defendant would be bound by the acts or

knowledge of Rosenquist in connection with the violation of this rule by Thompson. He was in Thompson's territory prior to the accident only five or six times. On one of these occasions a county fair, at which defendant had a booth and exhibit, was being held, and Thompson gave rides to certain guests from the booth to the base of supplies at the hotel in Thief River Falls and return. This was in the presence of Rosenquist. It was also in the presence of certain other agents, but their knowledge was not the knowledge of the defendant, as we have already pointed out. This was a special occasion. The rides were short ones, given to customers and others in connection with the county fair exhibit. Aside from this occasion, plaintiff and two other witnesses testified to rides prior to the accident in the presence of Rosenquist about the town of Thief River Falls. These were all short rides. The vehicle furnished Thompson was not designed for the purpose of carrying passengers. Thompson had no actual authority to carry passengers; there was no presumption that he had authority to carry passengers; and the burden of proof was upon plaintiff to show that the defendant had by its acts waived or abandoned the rule which forbade Thompson to carry passengers. Rides given by Thompson without the knowledge of the defendant or its agent having authority over Thompson could not clothe Thompson with ostensible or apparent authority. Duree v. Wabash R. Co. (C. C. A. 8) 241 F. 454; Chicago, St. P., M. & O. R. Co. v. Bryant (C. C. A. 8) 65 F. 969.

The ride which plaintiff was taking at the time of receiving his injuries was not a short ride about town, but was a long journey, and there is no evidence that Thompson ever on any previous occasion, with the knowledge of the company, took a guest with him on such a journey.

▉ Accepting, as correctly announcing the law, the instruction of the court on this question, we are of the view that the testimony is insufficient to establish such waiver or abandonment. The fact that Rosenquist may have known that Thompson on a few occasions gave short rides to third parties at Thief River Falls cannot be said to be evidence of substantial character that the defendant intended to waive and abandon its written rule which forbade Thompson from using the car for such purposes.

In Murphy v. Barry, 264 Mass. 557, 163 N. E. 159, 160, in which plaintiff was injured while assisting defendants' truck driver in delivering laundry, and in which there was evidence that defendants on many occasions saw plaintiff helping their driver and had not talked to him nor ordered the driver to keep him off the premises, it is said: "The defendants would not confer the authority nor ratify the act by seeing the plaintiff about their premises and saying nothing to him, nor by failing to order that he be kept off the firm's trucks."

▉ Clearly, Thompson was not acting within the scope of his employment when he invited plaintiff to become his guest, and we are of the view that the evidence in this case falls far short of clothing him with ostensible or apparent authority.

▉ At the time of receiving his injuries, plaintiff was in the employ of his father, while Thompson was in the employ of the defendant. Thompson was acting in the course of his business for defendant, and plaintiff was acting in the course of his employer's business, in part at least. Following the accident, plaintiff was awarded compensation under the Minnesota Workmen's Compensation Act in the sum of $5,625.67, which has been paid by the insurer of plaintiff's father. We are bound by the construction placed upon the Minnesota statute by the Supreme Court of Minnesota. E. C. Warner Co. v. W. B. Foshay Co. (C. C. A. 8) 57 F.(2d) 656; Odegard v. General Casualty & Surety Co. (C. C. A. 8) 44 F.(2d) 31; Lamoreaux v. Lamoreaux (C. C. A. 8) 26 F.(2d) 47.

▉ The concluding paragraph of the Minnesota Workmen's Compensation Act (Minn. St. 1927, § 4291) reads as follows: "The provisions of Subdivision 1 of this section shall apply only where the employer liable for compensation under part 2 of this act, and the other party or parties legally liable for damages were engaged in the due course of business, (a) in furtherance of a common enterprise, or (b) the accomplishment of the same or related purposes in operation on the premises where the injury was received at the time thereof, and not otherwise."

It seems clear that the employers, plaintiff's father and the defendant, were not engaged in a common enterprise, nor in the accomplishment of a related purpose. The automobile was, to be sure, used as a common vehicle, but for the accomplishment of two distinct and separate purposes, and the public highway could not be said to be "prem-

ises" within the meaning of the Minnesota statute. Gile v. Yellow Cab Corp., 177 Minn. 579, 225 N. W. 911; Duus v. Duus, 181 Minn. 232, 232 N. W. 114.

We conclude that the court correctly held that plaintiff is not precluded from maintaining this action because of the recovery of compensation from his employer under the provisions of the Minnesota statute.

The judgment appealed from is reversed, and the cause remanded, with directions to grant defendant a new trial.