**UNITED STATES of America,**
**Appellant,**

v.

**Stewart M. ALEXANDER, Jr.,**
**Appellee.**

**No. 7162.**

United States Court of Appeals
Fourth Circuit.

Argued April 23, 1956.

Decided June 5, 1956.

William W. Ross, Atty., Dept. of Justice, Washington, D. C. (Warren E. Burger, Asst. Atty. Gen., Edwin M. Stanley, U. S. Atty., Greensboro, N. C., and Melvin Richter, Atty., Dept. of Justice, Washington, D. C., on brief), for appellant.

Daniel K. Edwards, Durham, N. C., for appellee.

Before PARKER, Chief Judge, SOPER, Circuit Judge, and THOMSEN, District Judge.

SOPER, Circuit Judge.

This suit was brought by Stewart M. Alexander, Jr. against the United States under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 et seq., to recover damages for injuries received while he was riding as a passenger in a United States Air Force aircraft, which crashed in attempting to land at the municipal airport at Evansville, Indiana on September 24, 1950. The Government denied liability on the grounds (1) that the flight, which was undertaken for Alexander's convenience, was unauthorized; and (2) that the evidence failed to show either that the aircraft was negligently maintained or that it was negligently operated. The district judge, however, found for the plaintiff and assessed the damages at $75,000.00. See Alexander v. Civil Air Patrol, D.C., 134 F.Supp. 691.

Alexander was a leading professional golfer. In September, 1950 he was playing in a tournament at Kansas City, Missouri and he desired upon the conclusion of the tournament on September 24 to go to his home in Lexington, North Carolina to visit his family before leaving on a golfing tour in South America. He discovered that he could not obtain the desired transportation by commercial airline at Kansas City to carry out his plan and when this became known representatives of the Civil Air Patrol procured a ride for him in an Air Force aircraft from Olathe, Kansas to Louisville, Kentucky where commercial air transportation to his home was available. The plane was furnished by the South Dakota Wing of the CAP. It had been assigned to First Lt. Oliver A. Singleton, USAF, who was a Liaison Officer of the USAF attached to the South Dakota Wing. With Singleton as pilot and Alexander and two CAP officers as passengers the plane took off from Kansas City to Louisville. The two CAP officers went along apparently for pleasure. The sole purpose of the flight was to enable Alexander to reach his home. As the plane approached Evansville the fuel in one of its tanks ran low and, when the pilot at-

tempted to switch to a full tank, a cotter pin on the handle of the switch sheared off and the change could not be made. Shortly thereafter both engines stopped for lack of fuel and a few minutes later, in attempting to land at the Evansville airport, the plane struck the ground and burst into flames. The pilot and the two CAP officers were killed and Alexander was severely burned and otherwise injured. The conclusion of the district judge that the aircraft was being operated at the time on the business of the United States in charge of an employee of the United States, acting in the line of duty, was based upon the relationship between the United States Air Force and the CAP and the liaison between them, and upon the circumstances under which the flight was undertaken.

The Civil Air Patrol was created in 1941 by Executive Order of the Director of Civilian Defense of the United States under the authority of the War Powers Act, 50 U.S.C.A.Appendix, § 601 et seq., and was later transferred to the War Department by Presidential order of April 29, 1943; and it functioned during the war under the Commanding General of the Army Air Force. It became a corporation by Act of Congress on July 1, 1946, whereby a number of private citizens were incorporated to encourage and aid American citizens in the contribution of their efforts and resources in the development of aviation and in the maintenance of air supremacy and to develop the voluntary contribution of private citizens to the public welfare. It was designed also to provide aviation education and training, especially to its senior and cadet members, and to encourage civilian aviation in local communities and to provide an organization of private citizens with facilities to aid in meeting local and national emergencies. The original membership consisted of more than 100,000 senior and cadet members; and eligibility for membership is determined by the constitution and by-laws of the corporation. It has no power to issue capital stock or engage in business for pecuniary profit, its object being solely of a benevolent character. It is required to make and transmit to Congress each year a record of its proceedings for the preceding year. 36 U.S.C.A. §§ 201–208.

By subsequent Act of Congress the Civil Air Patrol is established as a volunteer civilian auxiliary of the United States Air Force; and the Secretary of the Air Force, in order to assist the CAP in the fulfillment of the objectives set out in the earlier Act, is authorized, under regulations prescribed by him with the approval of the Secretary of Defense, to furnish the CAP from available stocks which are in excess of the Government's requirements, with aircraft, motor vehicles and related supplies. The Secretary of the Air Force is also authorized to permit the CAP to use such services and facilities of the Air Force as in his opinion are required by it to carry out its mission and to this end to furnish it with fuel; and to establish and maintain liaison offices of the Air Force at national, state and regional headquarters of the CAP; and to detail military and civilian personnel of the Air Force to such offices and to assist the CAP in its training program. 5 U.S.C.A. § 626*l*.

Air Force Regulations promulgated under the authority of this statute provide for the administration and organization of the CAP, auxiliary of the Air Force. See Air Force Regulations 45–11 to 45–14. National headquarters are provided, which are directed to supervise all CAP activities under the jurisdiction of the Air Force. It is provided that the National Commander of CAP shall be a regular United States Air Force general officer who serves in the dual capacity as its head and also as commanding general of the Headquarters Squadron, CAP, USAF. At the time of the accident in this case the National Commander was Major General Lucius B. Beau, USAF, and Lt. Singleton, USAF had been assigned as liaison officer to the South Dakota Wing of the organization, which is one of the fifty-one wings set up in the continental United States and the Territories under the Regulations.

As a liaison officer he was part of the headquarters squadron and was not subject to the orders of the CAP Wing Commander or his staff. His duties as liaison officer were to advise and assist the CAP Wing Commander and staff on military matters in the administration of CAP units in the state to which he was assigned. He was furnished with an Air Force plane which he was to utilize as much as possible on trips of not more than one day to visit CAP units. He was permitted to absent himself from his station for periods of twenty-four hours in the performance of his instructional duties. He was to devote full time to the execution of his duties, as above set out, but was cautioned that this should not be construed as limiting by any means his duties as liaison officer. The importance of "selling" the CAP to the public was emphasized.

While the golf tournament at Kansas City in which Alexander was engaged was going on in September 1950, officers of the CAP were negotiating with a committee of the Professional Golfers Association (P.G.A.) in regard to a plan to raise money for the official purposes of the CAP, which included the recruiting of new members and the training of CAP cadets. This plan had received the approval of General Beau. It was contemplated that members of the P.G.A. would participate from time to time in golf tournaments in various parts of the country under the auspices of CAP; and that the golfers would donate their services and the funds derived from the tournaments would go to CAP. This organization on its part would undertake to transport the tournament players to and from the golf courses in suitable aircraft. The negotiations had not been completed and the project had not been formally approved by the headquarters of CAP but the golfers who were expected to participate had indicated their willingness to do so. Alexander was one of the golfers whom the officers of the CAP hoped to induce to co-operate in carrying out the plan. It was under these circumstances that Alexander's

difficulty in securing air transportation to his home came to the knowledge of Col. Myhra, a CAP officer, and Capt. McCoy, an Air Force Liaison Officer, who were conducting the negotiations with the golfers. Through their efforts transportation was arranged for the flight which turned out disastrously. The South Dakota Wing agreed to furnish an Air Force plane, which had been assigned to Singleton, and upon the request of the CAP officials he agreed to fly the plane to Olathe, Kansas airport to pick up Alexander and transport him to Louisville. The purpose of the CAP officers in making the arrangements was to promote the project for raising money as above described.

The district judge was of the opinion that Alexander could not recover unless Singleton had authority to take him on the plane; but the judge thought that this authority was contained in the regulations which covered the use of United States aircraft. In his opinion he did not specify the particular regulations that he had in mind. We think that this conclusion was an error because it overlooks the express provisions of regulations which govern the carriage of passengers in military aircraft other than aircraft operated by Military Air Transport Service. See Air Force Regulations 76-6 and 76-7 which relate to Departments of the Army, the Navy and the Air Force and establish the authorization for personnel who may ride in military aircraft. 15 F.R. 484.

The permissible provisions most nearly applicable to the present controversy are the following:

(1) Military personnel of the Air Force Reserve may ride as passengers in military aircraft upon presentation of orders by competent authority, which is defined as an official bearing the title of Commanding Officer or higher authority in the chain of command of various branches of the Government service.

(2) CAP senior members may be carried as passengers in military

aircraft when engaged in the performance of official CAP duties upon presentation of orders.

(3) Any person in case of an emergency involving catastrophe or possible loss of life, or in an emergency when other means of transportation are not available, feasible or adequate.

(4) Any individual when the travel is primarily of official concern to the national military establishment, when authorized by the Chief of Staff of the United States Army, Chief of Naval Operations or Chief of Staff of the United States Air Force.

These Regulations are made applicable to CAP passengers by Air Force Regulation 60–1, under the caption CAP PASSENGERS IN AIR FORCE AIRCRAFT, which specifically provides that all flights of CAP passengers will be accomplished in compliance with Air Force Regulations 76–6 and 76–7 and that CAP senior members are authorized to be carried in Air Force aircraft when engaged in the performance of official CAP duties and accompanied by written orders authorized by the National Commander, CAP.

It is obvious that none of these provisions cover the case of Alexander. He was not a CAP member engaged in the performance of CAP duties; nor was he a person in an emergency where other means of adequate transportation were not available, nor an individual whose travel was primarily of official concern to the national military establishment. It is true that he was an inactive Air Force Reserve officer but he was not under orders and his travel had not been authorized by competent Reserve authority. Regulation 76–6 contains the express provision that the transportation of National Guard and Reserve personnel in military aircraft other than as set out in the Regulation is not authorized.

 These Regulations have been worked out with great care and precision by the highest governmental authority under the terms of the statute and it goes without saying that neither the CAP officers who made arrangements for the flight nor the Air Force lieutenant who undertook it had authority to disregard them. It is also true that even the Commanding General in charge of the headquarters of the CAP had no such power. On November 15, 1950, after the fatal accident, General Beau issued an order indicating that Singleton was placed on duty for one day as of September 24, 1950, to travel from Sioux Falls, South Dakota to Olathe, Kansas and thence to Louisville, Kentucky for the purpose of coordinating Air Force-CAP activities. What effect this may have had upon the military record of the deceased airman we are not prepared to determine; it is sufficient to say that it did not repeal the Regulation *pro hac vice* any more effectively than if it had been issued in advance of the flight. For like reasons it is immaterial that, in answering interrogatories in this case, the United States stated that Singleton's death was considered by the Air Force to have been incurred in line of duty; and that under his general authority from the United States Air Force he was entitled to use the aircraft to assist the CAP in its efforts to raise funds for its legitimate purposes. See United States ex rel. Accardi v. Shaughnessy, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681; Federal Crop Ins. Corp. v. Merrill, 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10; Utah Power & Light Co. v. United States, 243 U.S. 389, 37 S.Ct. 387, 61 L.Ed. 791; Parrish v. United States, D.C.M.D.Ga., 95 F.Supp. 80.

 These considerations warrant the conclusions that the CAP is not a Federal agency within the meaning of the Federal Tort Claims Act and that Singleton, who was a commissioned officer in the Air Force, acted contrary to the governing regulations and beyond the scope of his authority in using the Air Force plane entrusted to him to enable Alexander to reach his home. The first of these conclusions is in accord with the

decision in Pearl v. United States, 10 Cir., 230 F.2d 243, where the court held that the United States had no liability for the death of a passenger on an official indoctrinating flight of the CAP in a CAP aircraft which was on loan from the Air Force and was piloted by a member of the CAP. It remains to determine whether the United States is liable for the injuries incurred in the course of the unauthorized flight undertaken by a commissioned officer in its service. This depends upon the terms of the Federal Tort Claims Act which restricts the jurisdiction of the court to civil actions on claims against the United States for injury to person or property caused by the act or omission of an employee of the Government while acting within the scope of his office or employment under circumstances where the United States would be liable to the claimant in accordance with the law of the state where the act or omission occurred. 28 U.S.C. § 1346(b).

■■ It was held in Williams v. United States, 350 U.S. 857, 76 S.Ct. 100, that even if it is shown in a suit under the statute that the injury complained of was caused by the act of a Government employee beyond the scope of his employment, the decision must be made in accordance with the doctrine of *respondeat superior* which is entertained in the law of the state where the injury occurred. Hence we turn for guidance to the law of Indiana, where the accident occurred; and we find the appropriate rule laid down by the courts of that state in the analogous situation of a person who is injured when riding in an automobile with the consent of an employee of the owner. In Dempsey v. Test, 98 Ind.App. 533, 184 N.E. 909, 911, it was held that a complaint did not state a cause of action which alleged that the plaintiff was injured when riding in an automobile-truck upon the invitation of the driver, when it did not appear that the owner was present when the plaintiff was injured or knew of his presence on the truck or had authorized the driver to carry passengers thereon, but, on the contrary, stated that the truck was used by the owner for the sole purpose of hauling products to and from a farm. In sustaining a demurrer to the complaint, the court said:

"While it is true that the facts pleaded show that the driver of the truck was discharging a duty of his employment when the injury to appellant occurred, it is also true that the invitation or permission given appellant to ride on the truck was that of the servant and not of the master, and that the giving of the invitation or permission was not within the general scope of the employment, or with a view of accomplishing some end thereof. In determining as to appellee's responsibility, under the facts averred, we must consider the question as to whether that which his servant did, when he invited or permitted appellant to ride on appellee's truck, was something which his employment contemplated, and something which he might do in his employer's name.

"It has been frequently held in this state that where a person is invited to ride upon a train of cars, by an employee who had no authority to give such an invitation, the carrier is under no duty to the party accepting any such invitation to exercise care to avoid injury to such person."

See also Pittsburgh, C., C. & St. L. R. Co. v. Hall, 46 Ind.App. 219, 90 N.E. 498, 91 N.E. 743; Indianapolis Motor Speedway Co. v. Shoup, 88 Ind.App. 572, 165 N.E. 246; for the general rule see Liggett & Myers Tobacco Co. v. De Parcq, 8 Cir., 66 F.2d 678, 685. It seems clear that this rule should be applied to the facts of the case at bar, which show not only that the presence of Alexander in the plane as a passenger was unauthorized but, also, that the flight itself, undertaken solely to serve Alexander's convenience, was unauthorized. It follows that the United States had no liability under the Indiana law for lack of care on the part of the pilot.

If it should be thought, however, that Alexander was rightfully invited as a guest of the Government in his flight to Louisville, the case would seem to be governed by the Indiana statute applicable to guests in motor vehicles, Burns' Ind.Stat. § 47–1021, which provides as follows:

"The owner, operator, or person responsible for the operation of a motor vehicle shall not be liable for loss or damage arising from injuries to or death of a guest, while being transported without payment therefor, in and upon such motor vehicle, resulting from the operation thereof, unless such injuries or death are caused by the wanton or wilful misconduct of such operator, owner, or person responsible for the operation of such motor vehicle."

This statute was made applicable to aircraft accidents by § 6 of the Uniform Aeronautics Act of Indiana, Burns' Ind. Stat. § 14–106, which provides as follows:

"The liability of the owner of one aircraft to the owner of another aircraft, or to aeronauts or passengers on either aircraft, for damages caused by collision on land or in the air, shall be determined by the rules of law applicable to torts on land." [1]

There would seem to be no doubt that Alexander was a guest at the time of his accident within the meaning of this statute as it has been interpreted by the courts of the state. It has been suggested that he was not being transported without payment because of the possibility that the courtesy extended to him would contribute to the formation of a beneficial arrangement which would increase the financial resources of the CAP. It has been held in Indiana, however, that the mere possibility of benefit to the owner of the vehicle is insufficient to exclude the guest relationship. Albert McGann Securities Co. v. Coen, 114 Ind. App. 60, 48 N.E.2d 58, 1000; Liberty Mut. Ins. Co. v. Stitzle, 220 Ind. 180, 41 N.E.2d 133; Ott v. Perrin, 116 Ind.App. 315, 63 N.E.2d 163. The mere possibility that the flight would result in material gain to the CAP in connection with an enterprise which was still in the tentative stage was too insubstantial to alter the status of Alexander as a non-paying guest.

■ There is no suggestion in this case that the injury to Alexander was caused by the wanton or wilful misconduct of the pilot who lost his own life when the equipment of the plane failed to operate. The maintenance and the operation of the plane were in the hands of the United States and the district judge found negligence on the part of the Government, in that the crash was caused by the failure of the gas selector pin to function and that the pilot knew that it had been stiff and hard to operate and there was no showing that the defect had been remedied by repair or replacement. The judge also found that the pilot was negligent in the manner in which he attempted to make the emergency landing. We need not examine the evidence on these points in detail, for even if it shows a breach of duty no one contends that it warrants a finding of wanton or wilful misconduct.

Reversed.

---

1. In 1951, after the accident to Alexander, Indiana passed an Aircraft Financial Responsibility Act, Burns' Ind.Stat. § 14–901 et seq. which incorporated in § 14– 924, the motor vehicle guest statute quoted above, so modified as to make the statute expressly applicable to a non-paying passenger in an aircraft.